THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* GEORGE SANDERS (Impleaded), Defendant-Appellant.

(No. 55453;

First District—July 17, 1972.

Gerald W. Getty, Public Defender, of Chicago, (Michael Weininger and James J. Doherty, Assistant Public Defenders, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Elmer Kissane and James R. Truschke, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE BURKE delivered the opinion of the court:

Defendant was found guilty at a jury trial of the crime of armed robbery. A motion for a severance having been allowed defendant and the penitentiary. He appeals.

On November 8, 1968, two Thillens Check Cashing Service guards were shot, one fatally, and a large sum of money taken from them at the Seeburg Corporation plant located at 1500 North Dayton Street in Chicago. An indictment was later returned charging the defendant and a man named Gene Lewis with murder, attempt murder and armed robbery. A motion for a severance having been allowed defendant and Lewis were tried separately.

A pre-trial motion was filed seeking the suppression of both a lineup identification and any in-court identifications of the defendant. After a hearing, the trial court sustained that part of the motion relating to the lineup identification on the ground that defendant was neither advised of his constitutional rights prior to the lineup, nor was he represented by counsel at the lineup. The trial court also ruled that the lineup was not unnecessarily suggestive, and reserved ruling on that part of the motion relating to the in-court identifications to determine whether they had a source independently of the lineup confrontation, without objection on defendant's part.

Monica Jagielnik testified for the People at the instant trial that she was employed as a receptionist at the Seeburg Corporation on November 8, 1968. She testified that on three occasions prior to that date a man identified by the witness as the defendant entered the reception area of the plant through a door located at 850 West Blackhawk Street and asked her where the employment office was located; the witness stated that there is a sign on that door which reads, "Employment Office, 1500 Dayton Street." She testified that the defendant was alone on two of the occasions and that on the third occasion he was accompanied by persons identified by the witness as Gene Lewis and a man named Holt.

Miss Jagielnik further testified that the third time that the defendant was at the plant was one week prior to the incident, which was a Friday, and that the defendant was in the plant on each of those occasions at approximately 4:00 P.M. The witness also stated that the Thillens guards made a regular stop at the plant on Fridays, arriving promptly at 10:50 A.M., and that they arrived at the plant promptly at 10:50 A.M. on November 8, 1968.

Rubin Aviles testified for the People that he was employed by the Seeburg Corporation on November 8, 1968, assigned to the second floor of the building. On that day the witness observed a person identified by him as Gene Lewis walking to a second floor rear door which led to the third floor of the building. The witness testified that he (the witness) then went downstairs where he was asked directions to the third floor of the building by a person identified by him as the defendant. Mr. Aviles testified that he observed the defendant proceed up the same stairwell as did Lewis shortly before.

Mr. Aviles stated that he was on his way back upstairs by way of the same stairwell shortly thereafter and that he observed the Thillens guards lying on the stairs. The witness testified that he did not see the guards enter that particular stairwell on November 8, 1968, but that he had observed them use that stairwell "before on a Friday."

Chester Koziol testified for the People that he was one of the Thillens

guards who was shot and robbed on November 8, 1968. He testified that he and his partner, Karl Galamaga, arrived at the Seeburg Corporation plant on that date, at their regular time, to cash the Seeburg employees' payroll checks during the employees' lunchtime. Koziol testified that he and Galamaga were dressed in police-type uniforms and that each was armed with a .38 caliber revolver. He stated that he and Galamaga were directed to cash checks on the third floor of the plant and that they entered the plant through the door leading to the reception area in order to go to the third floor. He testified that each man was carrying cash money in coins and currency, and that Galamaga was carrying an amount in excess of $40,000. The witness testified that the currency was folded lengthwise, with the green side facing out, to facilitate and speed the cashing of checks; he stated that this manner of folding the currency was a custom of the Thillens Service.

Mr. Koziol testified that after he and his partner passed through the reception area of the plant they went up a stairway to the second floor, across a small plant area, and into a stairwell leading to the third floor of the plant. The witness testified that as they neared the third floor landing, he heard a shot, observed Galamaga falling and, out of the corner of his eye, saw someone above him with a gun. The witness testified that he jumped halfway down the stairs, took hold of the banister, was shot in the upper part of the back, and fell face down on the landing between the second and third floors of the building. Mr. Koziol testified that after Galamaga was shot and prior to being shot himself, he heard footsteps on the stairs which sounded like more than one pair of feet. The witness stated that he did not lose consciousness after he was shot, that he heard the sound of falling money, and that someone picked up the money and took his gun from his holster. The witness was unable to identify the person who was holding the gun on him after Galamaga was shot, other than to say that he was a male Negro wearing large sunglasses covering half his face. Galamaga died as a result of his wounds.

John Untinen testified for the People that he was employed by Seeburg Corporation on November 8, 1968 and that he desired to have his check cashed. He testified that he proceeded to the stairwell at the rear of the building and observed the guards lying on the stairs.

John McCoy testified for the People that he had known the defendant for a period of thirteen or fourteen years. The witness testified that at about 11:30 A.M. on November 8, 1968, he telephoned the defendant's residence but the defendant was not at home. The witness testified that he spoke to the defendant at about 1:00 or 2:00 P.M. later that day, and informed the defendant that he (the witness) wished to bail his wife out of jail. The witness testified that he then went to defendant's residence

where the defendant gave the witness some money. He testified that there was a fold in the money given to him by the defendant which was the same as that in the money taken from the Thillens guards.

McCoy testified that he, the defendant and a girl named Cen Cross drove to a barber supply shop, from which the defendant emerged with a bag. They then proceeded to the vicinity of 46th Street and Prairie Avenue where defendant left the vehicle with the bag. Defendant later returned with the bag, the girl was driven to a location and dropped off, and the defendant and the witness proceeded to the apartment of a man named "Gene" located at 14th Street and Loomis Avenue. The defendant and Gene entered a bedroom and conversed a short while, and when they emerged the defendant was still in possession of the bag. The witness described the bag as "a little leather bag which is about nine or ten inches long and about three or four inches wide." The witness further testified that he did not have occasion to observe the contents of the bag. The witness further testified that he was arrested by the police the following day, and that some of the money given to him by the defendant was confiscated by the police. He stated that additional funds given to him by the defendant were also confiscated by the police upon a search of the witness' residence.

Police Officer Jerry Sullivan testified that he arrested John McCoy on November 9, 1968, and that he recovered from McCoy currency which was folded in the same manner as that taken in the Seeburg robbery.

Louise Hart testified for the People that she was with Gene Lewis in the late afternoon of November 8, 1968, and that Lewis had in his possession a bag containing a gun and a great deal of money.

Police Commander Flanagan testified that after defendant's arrest, defendant stated to the witness that he had spent the night of November 7th and the morning of November 8th with Cen Cross, that he arrived at his place of employment as a barber at about 10:00 A.M. on November 8th, and that he worked at the shop until 5:30 P.M. that day. Paul Perkins and Ralph Hill testified that they were employed as barbers in the shop where defendant worked and stated that the defendant did not arrive at the shop until late in the afternoon on November 8, 1968.

Robert MacAdo and Mylan Cross testified for the defendant that they were with the defendant from morning until late afternoon on November 8, 1968. Cen Cross testified that she was with the defendant during the same period of time, and on cross-examination she admitted giving a written statement to the police wherein she said that the defendant was out of her presence from the early morning of November 8, 1968, until about 3:00 P.M. that day. She further testified that John McCoy came to the apartment to see the defendant that afternoon.

The jury returned a verdict finding the defendant not guilty of the crimes of murder and attempt murder, and guilty of the crime of armed robbery.

■■ Defendant's first contention is that he was denied the right to be represented by counsel at the lineup. This contention is obviated by the recent decision of the United States Supreme Court in the case of *Kirby v. Illinois* (U.S. June 7, 1972), 40 U.S.L.W. 4607, holding that an accused does not have a right to counsel at a pre-indictment lineup. (See also *People v. Palmer*, 41 Ill.2d 571, 244 N.E.2d 173.) Defendant cannot be heard to complain in this regard for the further reason that the trial court sustained his motion to suppress the lineup identification on the ground that he was not represented by counsel at the time of the lineup.

Defendant also contends that he was denied due process of law because the in-court identification of him by People's witness Aviles was the product of a lineup which was unnecessarily suggestive and which identification lacked an independent origin. We disagree.

■■ Where an in-court identification is shown to have a basis independent of the lineup identification, the in-court identification is admissible into evidence apart from the question of whether or not the lineup was unnecessarily suggestive. (*People v. Gates*, 123 Ill.App.2d 50, 259 N.E.2d 631.) In the instant case it is clear from the record that People's witness Aviles had ample time and opportunity to observe the defendant on November 8, 1968, when the defendant approached the witness and asked directions to the third floor of the Seeburg plant. This was sufficient to serve as a basis for the witness' in-court identification of the defendant, independent of the lineup confrontation.

■■ Defendant next contends that he was denied his right to a fair trial, first, by the People's evidence showing an association between him and Gene Lewis, who had been convicted under the indictment prior to the instant trial, and second, by certain remarks made by the prosecuting attorney at trial.

References to Gene Lewis in the instant case were not improper. The People's theory was that the defendant and Gene Lewis were conspirators. The only eyewitness to the shootings and the robbery was unable to identify the perpetrator, and consequently it was solely through the use of circumstantial evidence that the People could link the defendant to the crime. The evidence concerning the defendant's association with Lewis was that Lewis was seen with the defendant at the Seeburg plant one week prior to the incident; that defendant and Lewis were both seen at the plant on the day of the incident, ascending the stairwell on which the incident took place; that they were seen together shortly after the incident; that Lewis had control of a bag con-

taining a gun and a large amount of money shortly after the incident; and that defendant also had a bag in his possession and was in control of a great deal of money which was folded in the manner as the money handled by the Thillens guards.

■■ Evidence of defendant's association with Gene Lewis was necessary to give the jury a complete picture of the defendant's own complicity in the incident at the Seeburg plant on November 8, 1968. The fact that Lewis had been convicted under the indictment prior to the instant trial is irrelevant, inasmuch as each member of the jury stated during the *voir dire* examination that he knew nothing of the Seeburg incident prior to trial, nor was anything brought out during the instant trial that Lewis had theretofore been convicted under the indictment.

The case of *People v. Rezek*, 4 Ill.2d 164, 122 N.E.2d 272, cited by defendant in support of this position is not applicable. In that case, Rezek's co-defendants were paraded before and identified by People's witnesses after those witnesses were unable to identify Rezek; that evidence served no purpose other than to improperly prejudice the jury. No such situation is presented in the case at bar. See *People v. Asey*, 85 Ill.App.2d 210, 229 N.E.2d 368.

■ We are also of the opinion that the remarks of the prosecuting attorney of which defendant complains, while leaving something to be desired, were not prejudicial to the defendant. Further, although objections to those remarks were sustained by the trial court, defense counsel persisted in commenting on the remarks after the objections were sustained, thereby complicating and inflaming the situation. See *People v. Woodley*, 57 Ill.App.2d 380, 206 N.E.2d 743, distinguishing the case of *People v. Freedman*, 4 Ill.2d 414, 123 N.E.2d 317, cited by the defendant in support of his position in this regard.

Defendant finally contends that his guilt was not proven beyond a reasonable doubt. He argues that such conclusion is evidenced in part by the "split verdict" returned by the jury. We disagree.

■■ The foregoing summary of the evidence reveals that the defendant was a participant in the incident at the Seeburg plant on November 8, 1968. Although there was no direct evidence of his participantion, the circumstantial evidence of his participation was overwhelming. The case of *People v. Magnafichi*, 9 Ill.2d 169, 137 N.E.2d 256, cited by the defendant is consequently inapposite on its facts from the case at bar.

■■ The fact that the jury found the defendant not guilty on the murder and the attempt murder charges of the indictment, whereas he was found guilty of the armed robbery charge, does not indicate a compromise verdict. On the contrary, the verdict was legally consistent, although not logically so; the crimes charged in the indictment were

composed of different elements, although they arose out of the same set of facts. See *People v. Hairston*, 46 Ill.2d 348, 263 N.E.2d 840, where the defendant was charged with murder and attempt murder, under the theory of accountability, as well as with the solicitation for those crimes, but where the jury returned verdicts of not guilty as to the former charges and guilty as to the latter. The defendant in the instant case was proven guilty beyond a reasonable doubt.

For these reasons the judgment is affirmed.

Judgment affirmed.

GOLDBERG, P. J., and LYONS, J., concur.